## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JEFFREY MILLS<br>4582 Indian Rock Terrace, NW<br>Washington, D.C. 20007 | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| THE DISTRICT OF COLUMBIA<br>John A. Wilson Building<br>1350 Pennsylvania Avenue, NW<br>Washington, D.C. 20004 | )<br>)<br>)<br>)<br>) |
| and | ) |
| KAYA HENDERSON<br>4110 13th Place, NE<br>Washington, D.C. 20017 | )<br>)<br>)<br>) |
| Serve: Office of the Attorney General<br>441 4th Street NW<br>Washington, DC 20001 | )<br>)<br>)<br>) |
| and | )<br>) |
| ANTHONY DeGUZMAN<br>7925 Germantown Avenue<br>Philadelphia, PA 19118 | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

Case No. 1:14-cv-00752

JURY TRIAL DEMANDED

## COMPLAINT FOR DECLARATORY
## AND MONETARY RELIEF AND JURY DEMAND

### Preliminary Statement

1.      This is a civil action by Jeffrey Mills against the District of Columbia, Kaya

Henderson, and Anthony deGuzman for the deprivation of his First Amendment right to free

speech and his Fifth Amendment right to liberty, in violation of 42 U.S.C. § 1983; for retaliation in violation of the District of Columbia Whistleblower Protection Act, D.C. Code § 1-615.53, and the District of Columbia False Claims Act, D.C. Code § 2-381.04; and for wrongful termination in violation of the public policy of the District of Columbia. Mr. Mills was terminated from his position as the Director of Food Services for the District of Columbia Public Schools ("DCPS") after repeatedly raising concerns about legal and contractual violations, including fraud, waste and abuse, by food services contractor Chartwells-Thompson School Dining Services ("Chartwells" or "the Company"), as well as DCPS's gross mismanagement of its food services program, which cost the District of Columbia millions of dollars.

2.     On numerous occasions between January 2010 and January 2013, Mr. Mills reported issues of fraud, waste, and abuse to D.C. government officials, including to DCPS Chancellor Kaya Henderson (directly and through her staff); to Mr. Mills' direct supervisor, Chief Operating Officer ("COO") Anthony deGuzman; and to DCPS legal counsel. Among other things, Mr. Mills reported that Chartwells failed to fulfill its contractual obligations to DCPS and that it deliberately overcharged for food and withheld rebates it had received from vendors, leading to significant monetary losses for the District. Mr. Mills also reported, and tried to remedy, DCPS's own mismanagement of the Chartwells contract, as well as the contracting process in food services that allowed for the submission of fraudulent claims for payment by Chartwells and which gave Chartwells unfair preference in the bidding process.

3.     Mr. Mills faced considerable pressure from Chancellor Henderson and DCPS officials not to press these issues further, and over time, she and Mr. deGuzman reduced his duties, publicly disparaged him, and made accusations of unethical conduct, which were found to be meritless. Despite a clear admonition from the Chancellor's staff that Mr. Mills was creating

problems by attempting to hold Chartwells accountable for its contractual violations and fraud, Mr. Mills continued to voice his concerns and attempt to remedy the harm to DCPS, its students, and D.C. taxpayers. On January 14, 2013, DCPS terminated Ms. Mills' employment, without basis or explanation.

## Jurisdiction and Venue

4.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a), as this matter concerns a federal question. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a).

5.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1), as the events or omissions giving rise to Plaintiff's claims occurred in the District of Columbia.

## Parties

6.     Plaintiff Jeffrey Mills is a citizen of the District of Columbia who resides at 4582 Indian Rock Terrace, NW, Washington, D.C. 20007. From January 2010 until his termination on January 14, 2013, Mr. Mills was employed by the District of Columbia as the DCPS Director of Food Services.

7.     Defendant District of Columbia is a municipal corporation headquartered at 1350 Pennsylvania Avenue NW, Washington, D.C. 20004, which governs Washington, D.C. pursuant to the District of Columbia Self-Government and Governmental Reorganization Act, P.L No. 93-108, 87 Stat. 774, D.C. Code § 1-201. DCPS is an agency of the District of Columbia headquartered at 1200 First Street, NE, Washington, D.C. 20002. At all times relevant to this Complaint, DCPS was the employer of Plaintiff Mills.

8.     Defendant Kaya Henderson is a resident of the District of Columbia who was at all times relevant to this Complaint employed by DCPS, an agency of the District of Columbia

headquartered at 1200 First Street, NE, Washington, D.C. 20002. From 2007 until October 2010, she served as Deputy Chancellor of DCPS. In October 2010, she was named Interim Chancellor of DCPS, and was sworn in as Chancellor in June 2011. In her official capacity, Chancellor Henderson is vested with final policymaking authority for DCPS, including food services, by §5 of the District of Columbia Education Reform Act of 2007, D.C. Code § 38-174, and by the delegation of authority to her from the Mayor of the District of Columbia. Chancellor Henderson is named in this Complaint in her individual capacity.

9. Defendant Anthony deGuzman is a resident of Pennsylvania who was at all times relevant to this Complaint employed by the District of Columbia as Chief Operating Officer ("COO") of DCPS, an agency of the District of Columbia headquartered at 1200 First Street, NE, Washington, D.C. 20002. In his official capacity, Defendant deGuzman was allowed by the District of Columbia to exercise policymaking authority over the provision of food services in the District of Columbia public schools. Mr. deGuzman is named in this Complaint in his individual capacity.

## Factual Allegations

10. The District of Columbia has faced, and continues to face, longstanding challenges with hunger, food insecurity, and obesity in its youth population. Public school food services programs play an important role in ensuring that children receive adequate nutrition. For many years, however, the DCPS food services program operated at a significant loss, costing residents of the District significant money while failing to deliver nutritious meals.

11. In 2008, in response to mounting losses in the DCPS food services program, former DCPS Chancellor Michelle Rhee ordered the outsourcing of food services operations to private contractors. As required by D.C. law, the DCPS Office of Food and Nutrition Services

4

("OFNS") approved a Determination and Findings ("D&F") for a Privatization Contract, which showed the privatization would improve the health of students while saving the District significant money. The goal of DCPS was to provide nutritional meals, increase participation in school meal programs among its approximately 47,744 students, and minimize the losses that were paid for by local funds.

12.     Chartwells is a partnership between Thompson Hospitality, LLC and Chartwells School Dining Services, a division of Compass Group (the largest contract foodservice company in the world). Chartwells won a one-year contract for 2008-2009 to provide food services to all DCPS schools, with four option years lasting through Academic Year ("AY") 2012-2013. The contract was a cost-reimbursement contract, with a firm fixed-price component for administrative fees and a firm fixed-unit price for management fees as required by federal regulations.

13.     In its bid, Chartwells estimated that if DCPS did not privatize food services, local public subsidies for food services would escalate dramatically. Chartwells guaranteed to minimize losses of local funds and to ensure that the Company itself bore much of the risk. Chartwells guaranteed that if losses exceeded a certain threshold for DCPS ("the guaranteed minimized loss"), it would reimburse the District for the difference between the actual loss and the guaranteed minimized loss (up to the total of the management and administrative fees plus $1 million). Chartwells made similar guarantees to minimize subsidies of local funds over the four option years: AY 2009-2010; 2010-2011; 2011-2012; 2012-2013.

14.     Chartwells calculated that the contract would provide savings of 49% to 76% in the overall budget over the course of the contract's four option years by increasing student participation in the meals program, increasing the number of meals served, and increasing

federal government reimbursement. Chartwells further promised to invest $4.3 million in

foodservices infrastructure, which DCPS would pay back on an amortized basis over the course

of the contract. Across the board, Chartwells failed to perform as promised over the life of the

contract: it overbilled, over-purchased, and overstocked to the District's detriment; failed to pass

on rebates from vendors as required; and was consequently responsible for multi-million cost

overruns each year from the inception of the contract.

<u>Academic Year 2008-2009</u>

15.     DCPS officials appeared to recognize that Chartwells' performance on the

contract was problematic from the start. In late August 2008, Chancellor Rhee's Chief of Staff,

Lisa Ruda, wrote to Chartwells President, Keith Cullinan, about "extreme disappointment in the

student meal program," listing deficiencies such as late or incorrect food deliveries, insufficient

staff, communications problems, and overall poor food quality.

16.     Chartwells and Preferred Meal Systems, a sub-contractor, served mostly pre-

packaged and highly processed food, which did little to improve student nutrition and health.

Nor did Chartwells save the District money as promised. For AY 2008-2009, Chartwells served

two million fewer meals than expected and served 23 fewer schools due to school closures, yet

DCPS faced more than double the expected net loss that Chartwells projected for that year.

17.     At the end of the base year of the contract, Mr. Mills' predecessor, acting Director

of Food Services, Gyimah Chin, gave Chartwells' performance an overall negative evaluation in

a formal written review. The evaluation noted: "The overall performance of this contractor

during the base year of the contract has been unsatisfactory to poor. . . . [T]he numerous

complaints and failures have resulted in a lack of confidence by DCPS leadership in the food

6

services operations." Despite Chartwells' unsatisfactory performance, DCPS entered into the first option year of the Chartwells contract for AY 2009-2010.

Academic Year 2009-2010

18.    In January 2010, Chancellor Rhee and Anthony Tata, who was then the COO for DCPS, hired Mr. Mills to fill the long-vacant position of Director of Food Services. Mr. Mills had a background as a successful restaurateur and food services consultant. After a brief period consulting with DCPS and observing what he believed to be the abysmal state of school food, Mr. Mills accepted an offer to work full-time for DCPS as its Director of Food Services. Mr. Mills accepted the position with DCPS because he saw an opportunity to apply his expertise and executive skills to effect positive change in the District's food and nutrition services, and in the health of DCPS students.

19.    At the time of his hire, Chancellor Rhee explained that she wanted Mr. Mills to improve food quality while controlling costs. In general, as Director of Food Services, Mr. Mills oversaw the daily operations of food services for the District's 123 schools.

20.    Mr. Mills immediately began to try to improve the quality of school food and to rein in costs. Among other things, Mr. Mills pushed for Chartwells to cook more meals onsite from scratch, rather than simply reheating precooked meals; encouraged DCPS management and the Office of Contracts and Acquisitions ("OCA" or "the Procurement Office") to modify the Chartwells contract to require DCPS approval of all menu items; established nutritional standards to ensure that DCPS school food met and exceeded national nutritional standards and complied with the United States Department of Agriculture's National School Lunch Program ("NSLP"); removed from school menus expensive and unhealthy items such as flavored milk, sugary snacks, and highly processed foods; and required that 20% or more of produce be

7

purchased locally – *i.e.*, within the Mid-Atlantic region.  Mr. Mills also commenced an initiative to allow for a pilot program at 14 schools to allow either healthy portable meals (boxed meals) for schools in transition (*e.g.*, Wilson High School, which was in a temporary location due to renovations) or to cook meals from scratch onsite.  Mr. Mills also designed other new meal programs to increase student participation and to ensure that low-income students received adequate nutrition, including by establishing the largest school supper program in the country and adding salad bars to nearly half of all schools.  He took on these initiatives with a staff that had been reduced from 44 employees when DCPS self-operated food services to just four employees at the time of his hiring.

21.     During Mr. Mills' tenure at DCPS, student participation in the food services program increased from 9 million meals served during AY 2009-2010 to 11.7 million in AY 2011-2012, and reimbursements for school meals increased from $16.5 million in AY 2009-2010 to $23.7 million in AY 2011-2012.  As a result, District taxpayer subsidies for food services reduced from $1.92 per meal in 2008 to 88 cents per meal in AY 2010-2011.  The District of Columbia Council ("the Council"), local press, parents, and even those at DCPS who resisted his reforms acknowledged Mr. Mills' objective achievements in the quality and quantity of meals served to DCPS students and in the overall improvements he made to DCPS food services.

22.     As Mr. Mills began implementing his food reforms in DCPS through the spring and summer of 2010, he quickly became aware that Chartwells was not performing as promised or expected, and was in fact costing (in some cases through fraudulent practices) the District a significant amount of money.  In looking back at Chartwells' performance prior to his arrival, he realized that it had failed to achieve its guaranteed minimized loss target and underperformed in numerous areas during the base year of the contract, costing the District millions of dollars.

Chartwells compounded the problems by failing to properly account for meals served, which led to DCPS incurring the costs of these meals while being unable to submit the costs for federal reimbursement. When Mr. Mills questioned Mr. Tata about these issues, Mr. Tata told him not to look backward, but to focus on moving forward with improving food services for DCPS.

23.    As he worked on implementing his many reforms, Mr. Mills and his staff became increasingly concerned that Chartwells inflated prices on food and non-food commodities and failed to pass on all vendor rebates to DCPS as required. During the spring and summer of 2010, Mr. Mills shared his concerns with DCPS officials, including Mr. Tata and officials in the Procurement Office. Mr. Tata responded that Mr. Mills should focus on the schools and not on "chasing down prices." Others at DCPS, however, had taken similar notice of Chartwells' problems.

24.    On April 27, 2010, DCPS Chief Procurement Officer Sayed El Baz sent a Notice to Cure Performance Deficiencies ("NTC") to Keith Cullinan, President of Chartwells School Dining Services, and to Warren Thompson, CEO of Thompson Hospitality Services. The NTC documented that Chartwells had overspent and underperformed on promised revenue. Chartwells' contract proposal had projected a cost of $28 million for 47,774 students, but actual costs were $29.6 million for only 44,734 students. Chartwells also failed to generate projected cash sales and reimbursements during the base year, resulting in $5 million less than projected revenue. The April 2010 NTC also noted that Chartwells had billed DCPS for approximately $4 million of its capital investment obligation under the contract, without specific information about spending as required. The NTC stated that "Chartwells has repeatedly refused to provide detailed rebate, discount and credit information" in violation of the contract. The NTC also cited multiple incidents of overstocking of food and resultant spoilage, with no financial

reimbursement to DCPS for waste and failure to comply with contract provisions regarding management of inventory and storage.

25.     The April 2010 NTC requested compensation for Chartwells' overspending and underperforming on revenue, as well performance improvements and transparency in documentation, particularly on DCPS-eligible discounts and rebates, as well as on capital investments. The NTC concluded by directing payment and performance by Chartwells.

26.     Chartwells responded to the NTC on May 13, 2010. While it acknowledged that some problems existed in the execution of the contract, Chartwells claimed that it owed the District no additional reimbursements and blamed DCPS for many of the problems that existed. No further effort was made by executive management at DCPS to hold Chartwells accountable or seek reimbursement.

27.     Despite Chartwells' numerous failings, and its refusal to accept responsibility, DCPS exercised its option to extend Chartwells' contract for the following year.

### Academic Year 2010-2011

28.     Mr. Mills was concerned about the deficiencies laid out in the April 2010 NTC and by Chartwells' overall nonperformance. His concerns increased significantly in June 2010 when a member of his staff, OFNS Program Coordinator Paula Reichel, spoke with a product vendor about Chartwells' business practices. This vendor had spoken with Foodbuy representative Dan Wescott, who explained that Chartwells made much of its profit from "back-end" rebates from major processed food companies. (Foodbuy, another Compass Foods company, negotiates large-scale rebates and discounts with vendors who work with Chartwells.) Mr. Wescott explained to the vendor that this was "just how business is done," and that Mr. Mills' insistence on switching to different vendors, rather than using Chartwells' "preferred"

vendors – *i.e.*, those that paid rebates – was going to cause an increase in the budget Chartwells allocated to DCPS for food.  Mr. Wescott explained that any new vendor would have to "play the game" by kicking back money to Chartwells and agreeing to submit invoices to DCPS reflecting higher prices than actually paid by Chartwells.  In short, Mr. Wescott made clear that Chartwells, through its rebate and invoicing practices, was charging DCPS more than its actual food expenses.

29.     Mr. Mills immediately shared the content of this conversation with his supervisor, Mr. Tata, who once again told him to focus on the schools and not to worry about "chasing down prices."  Mr. Tata encouraged Mr. Mills to be a "good partner" with Chartwells.

30.     On numerous occasions during the summer of 2010, Mr. Mills informed DCPS officials, including Mr. Tata and Glorious Bazemore, Deputy Chief Procurement Officer, that Chartwells' main competitor, Sodexo, had settled a lawsuit in July 2010 with the New York Office of the Attorney General for $20 million related to its rebating practices.  Mr. Mills explained that there existed wide-ranging investigations into such rebate practices within the food services industry.  The District failed to take any action to pursue a similar remedy.

31.     Chartwells continued to exhibit the same problems during AY 2010-2011 that it had the previous year, and Mr. Mills proposed multiple cost-saving proposals to Ms. Ruda and Chancellor Kaya Henderson, who had taken over for Chancellor Rhee.  These proposals had the potential to save DCPS millions of dollars per year.  For example, Mr. Mills sought approval in the fall of 2010 to switch 13 schools to another vendor for a savings of $2.5 million per year.  Former Chancellor Rhee approved the switch, but Chancellor Henderson refused to allow the proposal to proceed.  In the spring of 2011, Mr. Mills sought approval for Revolution Foods to take over that year's summer programs, which would result in a $20,000 profit rather than a

$350,000 loss with Chartwells. Chancellor Henderson rejected the plan. In early 2011, Mills also sought approval to switch 44 schools to Revolution Foods for an estimated savings of $5.5 million per year. Chancellor Henderson rejected this proposal as well.

32.     By March 2011, DCPS and Chartwells were engaged in a dialogue regarding cost overruns under the contract. Chartwells argued to Chancellor Henderson that the cost overruns were caused by DCPS switching from its "preferred vendors" to the vendors Mr. Mills insisted on using because they provided higher quality foods. Chartwells, however, failed to account for its failure to acknowledge or pass along rebates provided to it by its preferred vendors, or the fact that costs per meal had actually been higher in 2008-2009, before DCPS switched to the healthier menus implemented by Mr. Mills. Mr. Mills provided this critical information to Chancellor Henderson, and also noted that Chartwells was not seeking out the lowest-priced products as required by the contract.

33.     Mr. Mills ensured that Chancellor Henderson and DCPS staff understood that competing interests were at work when Chartwells recommended or declined particular vendors. Mr. Mills informed them that Chartwells demands rebates from all vendors, including vendors for food, capital equipment, and contracted labor. Neither Chancellor Henderson, nor any other DCPS official, responded to or acted on Mr. Mills' concerns.

34.     By May 2011, DCPS had exercised its option to extend Chartwells' contract for the following school year, even though Mr. Mills had presented to DCPS officials other options, including drafting a new RFP and expanding the roles of vendors D.C. Central Kitchen and Revolution Foods, which would have saved the District significant money. In August 2011, DCPS and Chartwells also executed a modification to the contract that limited Chartwell's payback obligation for AY 2010-2011 to its "earned management fee."

12

Academic Year 2011-2012

35.    Mr. Mills soon came to realize that DCPS itself – including Chancellor Henderson and others in senior DCPS management – severely mismanaged the food service program and contracting process, which contributed to the District's financial losses, interfered with students' ability to get proper nutrition, cut into instructional time, and subjected the District to potentially massive fines from the federal government and to lawsuits from prospective vendors. For example, by the summer of 2011, Mr. Mills realized that DCPS was guaranteed to lose a substantial amount of money, and that the food services program had not been budgeted enough money to cover that loss and meet all of its contractual obligations. Mr. Mills brought this fact up repeatedly to Chancellor Henderson and Ms. Ruda, in person and by email, asking them either to renegotiate the Chartwells contract to allow him to bring in new vendors or obtain additional funds from the D.C. Council so that he could make all contractually-required payments. Despite Mr. Mills' persistence, Chancellor Henderson and Ms. Ruda never took any action to correct the problems.

36.    In October 2011, DCPS hired a new Chief Operating Officer, Anthony deGuzman, to replace Mr. Tata, who had left approximately one year prior. In addition to informing him of the many problems with Chartwells, Mr. Mills explained to Mr. deGuzman that DCPS had given the food services program a budget that was far too small to meet its contractual obligations. Mr. Mills and members of his staff took Mr. deGuzman, who had no prior experience in food services, to visit four other school districts that were serving healthy food and not losing money – which was true of the overwhelming majority of districts – to demonstrate the advantages of improving the DCPS food service system and to show the means by which it could be accomplished.

37.    Mr. deGuzman initially seemed committed to improving food services and collaborated with Mr. Mills and his team to develop a presentation to explain to District officials, including Chancellor Henderson, how DCPS food services worked. Mr. deGuzman also indicated to Mr. Mills that he was interested in bringing some food services in-house to save money and have more control over quality.

38.    Mr. Mills also raised with Mr. deGuzman and Chancellor Henderson's staff the idea of working more with alternate vendors, such as D.C. Central Kitchen and Revolution Foods, contractors who were servicing the pilot programs at 14 test schools at a considerably lower cost-per-meal than Chartwells. He noted that Chartwells was losing increasingly more money for the District each year.

39.    In or around November 2011, Mr. deGuzman told Mr. Mills that he had approached Chancellor Henderson about bringing some food services in-house in some schools, and that she had committed to doing so, starting with a pilot program. He asked Mr. Mills to prepare different proposals to present to Chancellor Henderson by early 2012, with a financial breakdown of the effects of bringing the food service program in-house to 25, 50, 75 or all DCPS schools. Mr. deGuzman worked closely with Mr. Mills and his team to develop these proposals, and they exchanged numerous emails about this between October 2011 and February 2012, leading Mr. Mills to believe that DCPS management was committed to exploring the possibility of bringing some or all of food services in-house.

40.    During the end of 2011 and the beginning of 2012, Mr. Mills repeatedly raised concerns within DCPS that Chartwells was overstocking food (which DCPS had to pay for but was left to rot), inflating and padding costs on its invoices, and still failing to pass along rebates

to DCPS. He met repeatedly with Mr. deGuzman and raised these issues frequently with the
Procurement Office, including Ms. Bazemore.

      41.     Specifically, Mr. Mills and his team learned from his regional managers and from
school principals that Chartwells was "stockpiling" or overstocking schools, ordering two or
three times as many perishable supplies as necessary, knowing they would go bad rather than be
used, and charging DCPS for all of it. Mr. Mills' team reported that Chartwells filled coolers
and even hallways with produce that would inevitably go bad before it could be used. Apart
from the obvious waste, this posed a significant problem because, although the federal
government reimburses DCPS for entire school meals that are "purchased" by students, it only
does so if the food is actually used in meals served to students. Chartwells, however, received
rebates on all the food it ordered – rebates it failed to pass on to DCPS – so by "stockpiling"
foods, it increased its own revenues. Mr. Mills also noticed a significant and inexplicable
increase in the total amount of food being ordered and $1 million more in food costs even though
approximately the same amount of meals were being served as in the prior academic year. Mr.
Mills reported these problems to Mr. deGuzman on multiple occasions by email and in person.

      42.     DCPS's failure to heed Mr. Mills' warnings regarding cost overruns ultimately
damaged his reputation. In December 2011, *The Washington Post* published an article stating
that the Mayor had to provide DCPS with a $20 million supplemental budget, $12 million of
which was misleadingly called "food service overruns." Upon information and belief,
Chancellor Henderson, her staff and/or Mr. deGuzman provided this information to the
*Washington Post*. D.C. Councilmember Mary Cheh later investigated this issue and concluded
that Mr. Mills was not at fault, as suggested in the *Post* article, and that the food service

program's budget, as set by the Chancellor, had been inadequate for its contractual requirements. However, the damage to Mr. Mills' reputation had already been done.

43.     In addition, the DCPS budget referenced in the *Post* article and submitted to the Council by Chancellor Henderson and her staff failed to account for the funds necessary to meet its contractual obligations. In early 2012, Mr. deGuzman asked Mr. Mills whether an additional $12 million (beyond what the Council had already allocated) would be sufficient, and Mr. Mills explained that food services actually needed approximately $13 million more to meet the contractual obligations made prior to his hiring. The Chancellor's office requested OFNS's spend plan for the remainder of the year, and when Mr. Mills' team submitted the plan identifying $13 million needed, the Chancellor's office responded that they needed to cut the figure by $1 million. Mr. Mills and his team explained that such a cut was impossible, since the funds were already committed to meet contractual obligations. Ultimately, the Chancellor's office submitted to the D.C. Council a budget for food services showing only $12 million needed. This revised budget had deleted $1 million in costs that were reimbursed by a government program, but had included the $1 million in reimbursement funds received, thereby hiding the $1 million shortfall.

44.     In AY 2011-2012, roughly the same number of meals were served to DCPS students as in the previous year, but Chartwells charged the District over $1 million more than the previous year, all in the category of food cost. The increased expenditures were due primarily to over-ordering and stockpiling of food.

45.     Between December 2011 and February 2012, Mr. Mills and his team drafted numerous NTCs, which Ms. Bazemore sent to Chartwells, regarding many of the issues noted above. Mr. Mills also insisted that Chartwells use the ordering and inventory software it was

obligated by contract to use, so that Mr. Mills' office could track any waste, fraud, or abuse, and be able to examine individual profit and loss statements for each school. DCPS had invested significant time and resources into making this software functional, including by hiring two technicians and purchasing costly software licenses. Chartwells refused to use the system properly or cure the issues Mr. Mills identified and refused to refund any money to the District.

46.     In January 2012, Mr. Mills and his team, working closely with Mr. deGuzman, completed various proposals for AY 2012-2013 showing different scenarios for bringing food services in-house in some or all of DCPS schools. In each scenario, DCPS would save considerably more money than under its contract with Chartwells. Mr. deGuzman said he would present the plans to Chancellor Henderson and the executive team. On January 12, 2012, Mr. deGuzman emailed Mr. Mills a rough outline of a presentation for Chancellor Henderson that provided detailed recommendations for DCPS food services, including bringing some portion of food services in-house. Over the next week, Mr. deGuzman and Mr. Mills' team exchanged numerous emails regarding the presentation.

47.     On January 17, 2012, Chancellor Henderson, Mr. deGuzman and Fonda Sutton, DCPS's liaison with the Council, met with Councilmember Cheh and her staff about food services. Upon information and belief, during the meeting, Chancellor Henderson agreed to provide the Council with the plans being drafted for bringing some food services in-house. She stated that DCPS would commit to doing something different with food services, and that the District had numerous options, including rebidding the contract and expanding the role of the pilot contractors. She also acknowledged that most of the profitable school districts do food services in-house, and stated that it was a question of when, and not whether, DCPS would bring food services in-house.

48.     In late January 2012, Mr. Mills learned that Mr. deGuzman and Chancellor Henderson planned to meet with Warren Thompson, CEO of Chartwells' minority contractor Thompson Hospitality, to discuss Chartwells' performance on the contract. Although he was Director of Food Services, Mr. Mills was not invited to this meeting. This was the first time that Chancellor Henderson or any other DCPS official had excluded Mr. Mills from any meeting with a food services contractor.

49.     On or about January 27, 2012, in advance of the meeting with Mr. Thompson, a representative of Chartwells sent to Chancellor Henderson and Ms. Ruda a document that touted Chartwells' performance under its contract with DCPS. Ms. Ruda forwarded the document to Mr. Mills, who observed that it contained numerous inaccuracies. Mr. Mills prepared talking points responding to Chartwells' claims for Mr. deGuzman and Chancellor Henderson to use during their meeting with Mr. Thompson.

50.     On February 2, 2012, Chancellor Henderson and Mr. deGuzman met with Mr. Thompson. After the meeting, Mr. deGuzman told Mr. Mills that he and Chancellor Henderson did not use Mr. Mills' talking points. Mr. deGuzman also said that Chartwells complained during the meeting that Mr. Mills was too critical of Chartwells' performance

51.     The day after the meeting with Mr. Thompson, DCPS unexpectedly announced its decision to issue a new RFP for food services contractors. Mr. Mills had anticipated that if DCPS chose not to renew Chartwells' fourth option year, it would bring some food services in-house and/or expand the contracts of existing vendors such as Revolution Foods or D.C. Central Kitchen. In the fall of 2011, Mr. Mills and his team, along with the Procurement Office, had made clear to Mr. deGuzman that if DCPS intended to seek a new vendor to serve a significant percentage of schools, they would need to know by December 2011 or early January 2012 at the

latest so that they would have sufficient time to prepare the RFP and select the new vendor in time for the start of AY 2012-2013. Mr. deGuzman had assured Mr. Mills that Chancellor Henderson had committed not to issue a large RFP for the next school year. Nevertheless, in early February 2012, immediately after her meeting with Mr. Thompson, Chancellor Henderson instructed Mr. deGuzman and Mr. Mills to issue a new RFP for a private vendor within two weeks. Issuing a major RFP within that timeframe is highly unusual and virtually impossible to accomplish.

52.     In early February 2012, Mr. deGuzman again met with Mr. Thompson, at the behest of Chancellor Henderson, to discuss the upcoming bidding process for a new food services contract. Mr. Mills was once again excluded from the meeting with Mr. Thompson.

53.     After the meeting, Mr. deGuzman told Mr. Mills that he had informed Mr. Thompson not only when the RFP would be released, but also that it would be a price-per-meal contract rather than a cost-reimbursable contract. Mr. Mills warned Mr. deGuzman that he was giving Chartwells an unfair and unlawful advantage. He told Mr. deGuzman that it was now necessary to inform the other bidders, and in an effort to remedy the harm, Mr. Mills was compelled to advise Revolution Foods and D.C. Central Kitchen, its other current food service vendors, that an RFP was forthcoming.

54.     After their private meetings with Mr. Thompson in February 2012, the attitude of Chancellor Henderson and Mr. deGuzman towards Chartwells' fraudulent practices and Mr. Mills' efforts to hold the Company accountable changed markedly. Both Chancellor Henderson and Mr. deGuzman were uniformly supportive of Chartwells, despite its longstanding and serious problems, and became increasingly hostile towards Mr. Mills' efforts to convince DCPS to hold the Company accountable or make needed changes.

55.     On February 9, 2012, Mr. Mills wrote to Mr. deGuzman to express his ongoing concern with Chartwells' stockpiling of food, and he stated that he did not believe that the NTCs were effective in stopping the problem. Mr. Mills suggested to Mr. deGuzman that DCPS notify the D.C. Office of the Inspector General ("OIG"). Mr. deGuzman said he would consult with Peter Weber, a special assistant to Chancellor Henderson, but Mr. Mills heard nothing further. Upon information and belief, DCPS executive management never contacted the OIG about the ongoing waste, fraud and abuse by Chartwells.

56.     On February 8, 2012, in preparation for an upcoming D.C. Council hearing on the future of DCPS food services, Councilmember Cheh's office sent DCPS a letter requesting documents and information, including the proposals for bringing some or all of food services in-house. Mr. Mills and his team prepared the responses and, as requested by Councilmember Cheh, included the presentation Chancellor Henderson had discussed with her previously (on which Mr. deGuzman had collaborated) regarding bringing food services in-house. On February 15, 2012, Mr. deGuzman submitted the final responses to Ms. Sutton, DCPS's liaison with the Council, who had also attended the January 17, 2012 meeting in which Chancellor Henderson agreed to provide this information to the Council. Ms. Sutton sent the responses and the presentation to Councilmember Cheh's office.

57.     After receiving the documents from DCPS, Councilmember Cheh emailed Chancellor Henderson to express her excitement at the proposals for bringing food services in-house. According to Mr. deGuzman, however, Chancellor Henderson was "pissed off" that the plan – which Mr. deGuzman had vetted and forwarded to Ms. Sutton – had gone to Councilmember Cheh. On February 21, 2012, Chancellor Henderson responded by email to

Councilmember Cheh that DCPS would *not* be moving forward with any plan to move food services in-house. Her email further undermined the credibility of Mr. Mills and his team.

58.     In March 2012, DCPS released the RFP. Because of the short time period provided by Chancellor Henderson for drafting, the RFP contained errors that required more than 50 modifications over the following six months, wasting time and money and creating confusion for potential contractors, which likely influenced them not to submit a proposal and thus reduced competition. Indeed, while more than one dozen vendors attended the RFP launch meeting, only a few, including the three incumbent vendors, ultimately submitted bids.

59.     Shortly thereafter, DCPS executive management chose to exclude Mr. Mills from the panel that would decide which vendors would be awarded contracts under the newly-issued RFP. This decision made no sense and was in fact unprecedented during Mr. Mills' tenure. During the 2010 RFP process and selection of pilot vendors, Mr. Tata informed Mr. Mills that as the Food Service Director, he was the only staff member required to be on all RFP panels.

60.     Mr. Mills concluded that neither Chancellor Henderson nor Mr. deGuzman intended to assist him in bringing Chartwells into compliance or recouping any funds for the District. Instead of seeking to enforce the many NTCs that had been issued to Chartwells and avoid future dealings with the Company, Chancellor Henderson and Mr. deGuzman now seemed eager to excuse the Company's abysmal performance and were attempting to tip the 2012-2013 RFP in Chartwells' favor.

61.     Seeking a way to resolve the problems, Mr. Mills and his staff, in accordance with a provision in the Chartwells contract that mandated that an audit of vendor performance be conducted, obtained the necessary requisition. The Procurement Office selected Federal Management Systems ("FMS") to conduct the audit. In a memorandum dated March 23, 2012,

which was prepared along with Mr. Mills, Joel Metlen, OFNS Manager of Contracts and Finance, set forth the areas to be assessed in the audit: (1) determine whether prices, rebates, discounts and allowances were consistent with the terms and conditions of the contract; (2) determine the extent to which non-compliant meals were served; (3) examine the food inventory system for discrepancies; (4) determine whether there were any other charges not authorized by the contract; (5) determine whether Chartwells followed proper procedures associated with the guaranteed minimized loss; (6) determine whether there were any major inconsistencies in inventories of equipment; and (7) review the accuracy of the 2008 D & F to determine if outsourcing the food services program had saved DCPS money and achieved other goals. Mr. Mills and his staff requested that FMS provide a preliminary report by early June 2012 so that the RFP panels would have the benefit of reviewing the audit results prior to awarding a new contract. While it is the role of the Procurement Office to oversee contracts, Mr. Mills and his team took the foregoing steps because the Procurement Office, and DCPS management generally, had failed to hold Chartwells accountable over the course of its contract.

62.    On or about April 1, 2012, Mr. Mills sent Mr. deGuzman a lengthy email about Chartwells' deficiencies, asking what, specifically, Mr. deGuzman wanted Mr. Mills to do to address those deficiencies. He also requested an explanation as to why he had been removed from the RFP panel, and noted that he was surprised by Chancellor Henderson's negative comments about him and his staff to the D.C. Council. In a meeting on April, 4, 2012, Mr. deGuzman insisted that any problems that existed with the food service program were caused by Mr. Mills' "difficult relationship with the vendors," particularly Chartwells, and claimed that Mr. Mills' NTCs – which are designed to identify deficiencies – were "slanted against" the Company. Mr. Mills noted during the meeting and in a follow-up email to Mr. deGuzman that in

a letter to Councilmember Cheh, Chancellor Henderson had criticized the food services team for

exhibiting "significant challenges" in managing food services contracts, and Mr. Mills asked for

clarification as to what her comment meant. Mr. deGuzman responded that Mr. Mills was wrong

for "saying a lot of bad things about Chartwells" and directed Mr. Mills to appoint another

employee within OFNS to be the liaison with the Company.

63.    Despite being stripped of his ability to communicate with Chartwells directly and

being excluded from the contracting process for the new food services contracts, Mr. Mills

continued to raise concerns to DCPS officials regarding Chartwells' waste, fraud and abuse

throughout the first half of 2012. These issues included, among other things, stockpiling, spoiled

food, rebate fraud, and improper documentation, all of which resulted in significant and

unnecessary cost to the District.

64.    In response to Mr. Mills' persistence in raising concerns about Chartwells' fraud,

waste and abuse, and his insistence that efforts to remedy the harm be made (efforts that were

outside of the scope of his duties and took him away from his core responsibilities), Chancellor

Henderson took several retaliatory actions in March and April 2012 that severely damaged – and

will continue to damage – Mr. Mills' professional reputation. On March 13, 2012, Chancellor

Henderson sent a letter to the D.C. Council in which she stated that she did not have confidence

in her food team. This letter, which unfairly suggested performance or integrity issues by Mr.

Mills, the head of the food services team, was obtained and posted on the Internet by a local

blogger, injuring Mr. Mills' professional reputation and calling into question his competence. In

an interview in April 2012, the *Washington Post* asked Chancellor Henderson how

Councilmember Cheh had received a copy of Mr. Mills' plan to bring food service in-house.

Chancellor Henderson falsely implied in the interview that Mr. Mills had provided the proposal

23

to Councilmember Cheh by some kind of subterfuge, thereby maligning his integrity, when in fact Mr. deGuzman and Ms. Sutton had sent the documents.

65.     A few weeks into their investigation, the auditors at FMS told Mr. Mills that they had already discovered egregious contract violations by Chartwells. Despite having been warned not to criticize Chartwells, Mr. Mills alerted Mr. deGuzman to these findings immediately, and on May 17, 2012, Mr. Metlen sent an email to Mr. deGuzman, Ms. Bazemore, and other DCPS officials reporting the "alarming issues and deficiencies" related to Chartwells already revealed by the auditors, which suggested that Chartwells owed the District millions of dollars..

66.     Rather than acting upon these preliminary results, Mr. deGuzman sought to delay and unduly influence the audit, ignore its preliminary findings, and ultimately, to dilute the results, which reflected poorly on Chartwells and on DCPS's oversight of the contract. Mr. deGuzman first sought to delay the audit in late May 2012 by insisting, unnecessarily, that Revolution Foods and D.C. Central Kitchen be added to the audit, and then by refusing to approve necessary requisitions for the expanded audit. Mr. deGuzman also made numerous changes to the scope of work of the auditors without informing Mr. Metlen, who was the Contracting Office Technical Representative ("COTR") for the FMS contract. The failure to inform the COTR of changes to the contract violated DCPS procurement rules.

67.     Mr. deGuzman also impeded the auditors' attempts to inventory food left behind in the schools by Chartwells, which had cost DCPS $1 million in 2012 alone. Due to its stockpiling and over-ordering, at the close of the school year in June 2012, Chartwells left hundreds of thousands of dollars in unused, surplus food inventory in the schools – including many perishables it charged to DCPS and simply left to rot. Not only did Mr. deGuzman fail to remedy the situation, Mr. Mills learned from Mr. Metlen on or about June 25, 2012, that Mr.

24

deGuzman had instructed the auditors to stop inventorying the food left behind in the schools.

Mr. Mills emailed Mr. deGuzman on June 26, 2012, to protest this decision, writing:

> These issues with excess inventory are a result of the over ordering of product by Chartwells that I alerted you to in February. This mismanagement of procurement and inventory management are the major factors contributing to the increase in costs th is year vs last year with Chartwells. It also explains why [Chartwells] pushed back on implementing an ordering and inventory system that would have brought these issues to light. . . .  It is absolutely essential that the auditors be allowed to finish their inventories this week so that the District can recoup the money that it is rightfully owed.

Mr. deGuzman did not permit the auditors to continue the inventory.  Ultimately, most of

this unused food, paid for by DCPS, had to be destroyed.

68.     In addition to delaying and attempting to influence the audit, Mr. deGuzman

sought to exclude Mr. Mills and OFNS from having any role in it.  In June 2012, Mr. Mills spoke

to Aubrey Stephenson, the President of FMS, to schedule a preliminary review of the audit.  Mr.

Stephenson told Mr. Mills that Mr. deGuzman had forbidden him to speak with Mr. Mills.  Mr.

Stephenson nevertheless informed Mr. Mills that it was imperative to "get this information out"

as soon as possible before a new contract was awarded to any vendor, explaining that everything

Mr. Mills had said about Chartwells was true.

69.     Around this time, Mr. deGuzman specifically informed Mr. Mills that it was not

his responsibility to manage food services contracts, repeatedly telling Mr. Mills during a June

2012 meeting that he was not to communicate directly with vendors and that all matters related

to the vendors should go through the COTR for the new food services contracts, Robert Jaber.

70.     Mr. Mills struggled unsuccessfully to get the audit report released before the

2012-2013 contract was awarded.  He encouraged Mr. deGuzman and other DCPS officials,

including Ms. Bazemore, to allow the RFP panel to have a chance to see the audit before a

contract was awarded.  Mr. deGuzman refused to sign off on the audit report or approve

requisitions for additional components that he himself had demanded. Instead, Mr. deGuzman took steps that delayed the release of the audit, and he forbade Mr. Mills and his team from meeting with the auditors, even though Mr. Metlen was the COTR for the audit contract.

71.    Meanwhile, the RFP process continued to face major problems. In June 2012, Mr. Mills learned from Mr. Metlen and Paula Reichel, OFNS Program Coordinator, that Ms. Bazemore had instructed the dietician reviewing the menus for the RFP proposals to change the scores for the vendors from failing to passing. Mr. Metlen and Ms. Reichel had given all of the vendors low overall scores and originally recommended to Ms. Bazemore that DCPS not contract with any of them. Faced with no other viable choice, the panel recommended that DCPS enter into the final option year of the Chartwells contract and rebid the contract in January 2013. Ms. Bazemore, however, instructed them to choose one of the vendors.

72.    Mr. Mills soon learned that he had been excluded from any decision-making regarding the food service RFP. In late June 2012, Mr. Mills received a telephone call from a Revolution Foods representative, telling him that Revolution Foods had been awarded the food service contracts for only three DCPS schools. As Director of Food Services, Mr. Mills had always reviewed food service contractor bids and costs, and had been asked to give feedback on the final recommendation and pricing. In this case, Mr. Mills was not even informed him that a contract had been awarded. After hearing from Revolution Foods, Mr. Mills obtained and reviewed the final contracts. He was dismayed to find that Mr. deGuzman and the Procurement Office had granted a contract for the great majority of the schools to Chartwells, based on what appeared to be outrageous terms. For example, under the new contract, the price per meal for the supper meal was three times what DCPS had been paying for the previous two years and significantly above the reimbursement available from USDA. While Mr. Mills' duties had been

truncated such that he no longer had the authority to participate in food service contracting issues, Mr. Mills immediately expressed his concerns about the final contracts to Mr. deGuzman and Ms. Bazemore, who dismissed them.

73.    Mr. Mills continued to communicate with FMS auditors throughout the summer of 2012, and learned that they had concluded that Chartwells owed DCPS at least $8 million and that it anticipated the number would rise as it completed the audit.  Mr. Mills emailed Mr. deGuzman on July 11, 2012, to tell him that DCPS had to release this information immediately. Mr. deGuzman refused to do so.

74.    In July 2012, Revolution Foods complained to DCPS about the contracting process for the RFP, noting that the Procurement Office had given the vendors a vague instruction only two days before RFP submissions were due, telling them that they should consider whether union labor was required and incorporate those costs into their proposals.  Due to its history with DCPS, Chartwells could easily modify its prices to include union labor on short notice.  Other potential vendors, however, could not realistically estimate those prices in two days, but DCPS refused to give the vendors more time.  In response to this and other information, the Council delayed approval of the food service contracts.  Faced with pressure from Mr. deGuzman, the Council ultimately approved the contracts.  However, the Council also sent Chancellor Henderson a letter on August 15, 2012, expressing its strong displeasure with her handling of the RFP process and urging her to take steps to bring food service in-house quickly. Revolution Foods later testified before the Council about the problems with the RFP process.

75.    After the Council approved its contract, Chartwells sent the Procurement Office many pages of major modifications it would require in order to sign the contract.  Despite his exclusion from the contracting process, and the clear message from DCPS executives that his

input regarding Chartwells was unwelcome, Mr. Mills strongly objected and told Ms. Bazemore that DCPS could not make major modifications post-award. Doing so would give Chartwells an unfair advantage, as other vendors would likely have decided to bid – or would have bid differently – had the modifications been in place pre-award. Mr. Mills and his team advised Mr. deGuzman and Ms. Bazemore that making such modifications violated procurement laws and could lead to lawsuits by other vendors, putting the food service program and public funds at unnecessary risk.

76.    Rather than heed his concerns, DCPS refused to allow Mr. Mills to see the final Chartwells contract before it was signed. He later learned that Ms. Bazemore and Mr. deGuzman had approved many of Chartwells' modification requests, making the Chartwells contract more favorable than those of the other two vendors.

<u>Academic Year 2012-2013</u>

77.    Upon Mr. Mills' return from a week's vacation in late July 2012, less than a month before the 2012-2013 school year began, Ms. Lujan, the Deputy COO, informed him that Mr. deGuzman had issued instructions that Mr. Mills and his staff were not to communicate with the food service vendors at all, nor to issue NTCs, further truncating the responsibilities he had assumed during his tenure. This posed a significant problem for Mr. Mills and food services, as prohibiting all direct communication with the vendors would impede the department's ability to coordinate services, and would negatively affect the opening of the schools.

78.    Around this time, Mr. Mills learned that DCPS and the Procurement Office had significantly expanded the role of the COTR for the new food services contracts. Whereas the COTR had previously held a more administrative or ministerial role, now the COTR served as the primary point person with vendors and had increased oversight duties and responsibilities.

After learning of these changes, and fearing that Mr. Jaber was not up to the task, Mr. Mills asked Mr. deGuzman if he could be the COTR for the new contracts. Mr. deGuzman said that as Director of Food Services, he could not. Mr. Mills then asked to install Mr. Metlen, who had a background in government contract management, as the COTR. Mr. deGuzman reiterated that Mr. Jaber would remain the COTR.

79.    As Mr. Mills had feared upon learning of the expanded COTR role, Mr. Jaber badly mismanaged communication with the vendors and failed to provide Mr. Mills and his department with accurate information necessary to prepare for school openings. Mr. Mills reported these problems regarding Mr. Jaber in a detailed memorandum to Mr. deGuzman on September 11, 2012, and he recommended that Mr. deGuzman replace Mr. Jaber as the COTR. Mr. deGuzman took no action in response to Mr. Mills' memorandum.

80.    Chartwells' performance under the new contract, with Mr. Jaber's oversight, continued to be abysmal. On the first day of school in 2012, Chartwells lacked meals or portions of meals for 30% of its schools, and DCPS was forced to purchase and deliver over 2,000 emergency meals, which Mr. deGuzman referred to as "not a big deal."

81.    Major problems with Chartwells' performance persisted under the new contract despite the obvious need for remedial action, but Mr. deGuzman and Ms. Bazemore specifically refused to approve any NTCs or fines for Chartwells' ongoing violations, despite Mr. Mills' repeated requests, or to meet with him to establish a mutually agreeable system for doing so. The serious problems Mr. Mills elevated to Mr. deGuzman, and about which he proposed to issue NTCs and fines, included: food service delays in 20% of Chartwells' schools which not only cost the District money, but also interfered with instructional time and resulted in hungry schoolchildren; Chartwells' failure to identify rebates in the cost-reimbursable side of its new

contract; Chartwells' failure to credit DCPS for emergency meals DCPS had to purchase and deliver when Chartwells repeatedly shorted deliveries during the first two weeks of AY 2012-2013; and the failure of Chartwells to operate numerous programs they were contractually obligated to run, including salad bars in more than 30 schools. In addition, after DCPS learned that Chartwells had hired a convicted sex offender to work in one of the schools it served, Mr. Mills insisted that a NTC be issued, explaining that Chartwells was putting D.C. schoolchildren in danger and that DCPS had to remedy the problem. Upon information and belief, no NTC was issued, but the employee was removed from DCPS.

82.    In addition to marginalizing Mr. Mills internally, Chancellor Henderson and others also disparaged him publicly. For example, in late September 2012, a CBS reporter contacted Mr. Mills regarding a story about the successful transformation of food in schools. Per protocol, Mr. Mills forwarded the reporter's contact information to the DCPS press secretary, who said she would speak with the reporter and get back to Mr. Mills. Several days later, Mr. Mills learned that Chancellor Henderson's office had instructed his colleague, Diana Bruce, who managed DCPS's contract with the school nurses, to participate in the CBS interview about school lunches. Mr. Mills was excluded from the interview, even though Ms. Bruce had no connection to food services, and could not answer the questions the reported intended to ask. Ms. Bruce later informed Mr. Mills that the rumor around DCPS was that he had been fired.

83.    Not understanding the ongoing and increasing reluctance of DCPS officials to hold Chartwells accountable and to recoup the significant funds owed to the District, Mr. Mills attempted to demonstrate that such actions were indeed possible and should be pursued. In September and October 2012, Mr. Mills emailed various D.C. officials, including DCPS legal counsel, explaining that New York state had reached a settlement of $18 million based on

Chartwells' overcharging of the New York public schools system. While it was outside the scope of his duties as Director of Food Services to report this conduct to DCPS legal counsel and to suggest such a course of action, he urged DCPS to take similar steps to recoup taxpayer money from Chartwells. Upon information and belief, the District took no such action.

84.     As the 2012-2013 school year wore on, the refusal of DCPS officials to hold Chartwells accountable continued. For example, as a result of certain contractual modifications to which Mr. deGuzman and Ms. Bazemore had agreed, Chartwells was invoicing DCPS $20,000 a month to oversee DCPS's equipment repair. Chartwells also refused to pass on to DCPS any rebates related to the equipment, in clear contravention of the RFP and contract. Although he had been cut out of the contracting process, Mr. Mills and his team contacted other school districts to determine best practices for handling equipment repair, and Mr. Mills proposed to Ms. Bazemore that DCPS contract with a separate vendor or reassume in-house responsibility for equipment repair in order to save the District money. In late October 2012, when Mr. Mills told Mr. deGuzman of this plan, Mr. deGuzman angrily told Mr. Mills that DCPS would not do it, regardless of whether it saved the District money.

85.     The prices negotiated in the 2012-2013 Chartwells contract and the post-award modifications DCPS had accepted led to very high costs in the fall of 2012. Because of these high costs, Mr. deGuzman told Mr. Mills in November 2012 that they needed to consider cutting the supper program (which was an important part of DCPS's goal of providing the neediest students with adequate nutrition) because the cost per meal – as negotiated by DCPS during the RFP process – was higher than the reimbursement rate. As he had previously advised Mr. deGuzman, Mr. Mills said that DCPS should either renegotiate the rate with Chartwells or use

another vendor, such as Revolution Foods, whose prices for supper were much lower. Mr. deGuzman refused to do so.

86.    Throughout the fall of 2012, Mr. Mills and his team continued to urge DCPS to issue fines to Chartwells and to hold the vendor accountable for its legal and contractual violations. He and his team provided to Procurement all supporting information the office requested, but DCPS still took no action.

87.    In November 2012, Mr. Mills traveled to Phoenix, Arizona to attend the Heartland Payment Systems ("Heartland") National User Training Conference, for which he accepted scholarship funds from Heartland, the vendor that provided DCPS with point-of-sale hardware and software. Heartland had offered Mr. Mills the scholarship in part because of OFNS's successful implementation of Heartland systems, which under Mr. Mills' watch had reduced costs by several hundred thousand dollars per year. When Mr. Mills returned from the training, DCPS legal counsel, on the advice of Mr. deGuzman, inexplicably reported him to the D.C. Board of Ethics and Government Accountability ("BEGA"), falsely suggesting that accepting a "scholarship" from Heartland was inappropriate, even though Mr. Mills and other employees had previously attended this training conference and others on scholarships.

88.    Around this time in late 2012, Mr. Mills received confirmation that despite his repeated complaints and the preliminary findings of the audit, Chartwells was continuing to use its preferred vendors, *i.e.*, those that paid rebates, to the detriment of DCPS. For example, Mr. Mills and his team learned that Chartwells had, without informing DCPS, switched from serving a fish product that Mr. Mills had approved in previous years to a lower-quality product provided by a vendor from which Compass received larger rebates.

89. On December 10, 2012, as a result of the increasing hostility and unwarranted scrutiny of his work, including the baseless BEGA charge, Mr. Mills reported by email to Ms. Ruda that he was suffering retaliation for his attempts to ensure proper contractual compliance and management, including his issuance of NTCs and fines. Mr. Mills reported in this email many of the problems about which he had previously complained to DCPS officials and the resistance he had faced in his efforts to hold vendors accountable.

90. Soon thereafter, Mr. Mills met with Ms. Ruda to discuss his email. She asked Mr. Mills why he wanted to be at DCPS, and said that he should go elsewhere to be a food services director. Mr. Mills said that he had no intention of leaving. Ms. Ruda told Mr. Mills that he had caused nothing but problems, and specifically referenced his persistent attempts to issue NTCs and fine Chartwells.

91. Also in December 2012, FMS delivered its original, unedited audit report to Mr. Mills. The audit's conclusions were consistent with the complaints Mr. Mills had long been making to DCPS officials. In short, the auditors concluded that privatizing food services did not result in cost savings for DCPS, but instead increased costs for the school nutrition programs by over 50%. The auditors concluded that Chartwells had seriously underbid its proposal for the original contract, resulting in $26 million more in costs over its original projection.

92. The FMS audit also found that, as Mr. Mills had long warned DCPS executives, Chartwells had not implemented the guaranteed minimized loss provisions and thus owed DCPS at least $8 million under the terms of the contract. FMS also determined that Chartwells did not obtain the best price possible for products, as it was required to do, leading to losses of at least $1 million during each school year. According to FMS, Chartwells also failed to account for or credit to DCPS the numerous rebates, discounts, and allowances it had earned based on DCPS

spending, resulting in additional losses to DCPS of at least $1.5 million, although the auditors observed that the lack of accounting by Chartwells made the total losses impossible to determine. Finally, the audit found evidence of significant overcharges by Chartwells of at least $900,000 annually, including for noncompliant meals and spoiled food.

93.     On December 20, 2012, the D.C. Council held a DCPS food services hearing. At the meeting, many citizens testified positively about food services, specifically praising Mr. Mills. Their only complaints related to the poor quality of the food Chartwells provided in 2012, after the new contract was in place, including its failure to utilize the salad bars. Council staffers met privately with FMS before the hearing. During the hearing, which Chancellor Henderson (through Mr. deGuzman) had instructed Mr. Mills not to attend, the Council questioned Mr. deGuzman about his efforts to make multiple, unnecessary changes to the audit, including removing charts, graphs, and entire sections.

94.     After learning of Mr. deGuzman's testimony, Mr. Mills spoke with Mr. Stephenson at FMS who confirmed that Mr. deGuzman had instructed him to remove all charts from the audit prior to the hearing. Mr. Stephenson also said that Mr. deGuzman had called him more than a dozen times during the weekend prior to the hearing to make additional changes designed to downplay the significance of the audit's conclusions. Mr. Stephenson reported to Mr. Mills that Mr. deGuzman had even asked him to reduce the report's recommendation on food service staffing to just four employees, rather than the 20 that the external auditors believed would be appropriate.

95.     Not long after the D.C. Council hearing, Chancellor Henderson falsely stated on the Kojo Nnamdi radio show that the reason the food services contracts ran at such a high cost and required extra local funds was because healthy food is more expensive. Such a claim was

clearly intended to place the blame for the cost overruns on Mr. Mills for insisting on providing higher-quality meals to students, when the real reasons costs were expanding was Chartwells' continued fraud and misconduct, and DCPS's refusal to hold the Company accountable. By this point Henderson knew that multiple school districts throughout the country were able to serve these healthy foods without millions of dollars of cost overruns.

96.    On January 7, 2013, Mr. Mills emailed the head of BEGA, Darrin Sobin, the Director of Government Ethics, regarding the BEGA complaint that had been filed against him. In his email, he detailed the reasons he believed that the complaint had been made in bad faith and in retaliation for his efforts to highlight problems with DCPS's food service contracts. He attached to the email a copy of his December 10, 2012 email to Ms. Ruda.

97.    On or about January 14, 2013, Mr. deGuzman sent Mr. Mills a meeting request for what Mr. Mills believed would be a discussion about the direction of the department and the handling of the Chartwells contract. When he arrived at the meeting, the Chief of Human Capital, Jason Kamaras, and an assistant were the only ones present, and they informed Mr. Mills that Chancellor Henderson had decided to terminate his employment. No reason was given for the decision. Mr. Jaber, the COTR for the food service vendor contracts and former Chartwells employee, was appointed to replace Mr. Mills.

98.    Since his termination, Mr. Mills has diligently, but unsuccessfully, searched for permanent employment in the food services field. Within the first two weeks of his termination, Mr. Mills met with numerous high-level contacts in the food services industry seeking new employment and references.

99.    Among the jobs for which Mr. Mills applied and was rejected was Director of the Baltimore County Public Schools ("BCPS") Office of Food and Nutrition Services. He was

given no reason for the rejection.  In October 2013, a BCPS official contacted Mr. Mills to request a reference for another job applicant for the Director position.  Mr. Mills said that he had applied for the position and was surprised that he had not been selected, or even interviewed. The BCPS official told Mr. Mills that, despite his qualifications, Baltimore could never hire him because he had clashed publicly with Chancellor Henderson, who is a powerful presence in the field of public education.

100.    Since Mr. Mills' termination, the number of meals served in DCPS schools has declined sharply, which has led to a misleading reduction in costs.  Many schools are no longer offering breakfasts or suppers, meaning that many children begin and end their days without adequate nutrition.  It is clear that Mr. Mills, DCPS students, and D.C. taxpayers have suffered and will continue to suffer for years to come because of Defendants' actions.

## COUNT ONE

### DEPRIVATION OF PLAINTIFF'S FIRST AMENDMENT RIGHTS IN VIOLATION OF 42 U.S.C. § 1983 AGAINST ALL DEFENDANTS

101.    Plaintiff incorporates as though fully restated herein each of the allegations stated in paragraphs 1 through 100 above.

102.    As an employee of Defendant District of Columbia, Plaintiff Mills was entitled by the First Amendment to the United States Constitution, through 42 U.S.C. § 1983, to speak freely on matters of public concern.  The First Amendment's guarantee of free speech is binding upon the District of Columbia through the Fourteenth Amendment to the United States Constitution.

103.    Plaintiff lawfully exercised his First Amendment right to speak on matters of public concern affecting the financial resources for the District of Columbia, as well as the health and well-being of D.C. schoolchildren.

104.    Plaintiff Mills exercised his First Amendment rights as a private citizen, as he spoke on issues that were not part of his official duties of Director of Food Services, but which were matters of public concern in that they implicated fraud, waste and abuse in the District of Columbia. Among other things, Mr. Mills raised issues related to: contract non-compliance and DCPS budgeting problems, neither of which was within his formal job duties; the issuance of Notices to Cure to Chartwells, a responsibility that properly belonged to the D.C. Office of Procurement; ongoing fraud, waste, and abuse by Chartwells, even after DCPS officials told him that vendor issues were not part of his responsibilities; and the RFP and procurement processes for DCPS, from which he had been deliberately excluded. Plaintiff Mills similarly reported issues of fraud, waste and abuse to the D.C. Council and DCPS legal counsel, which was outside his official duties.

105.    Defendants retaliated against Plaintiff Mills for the exercise of his First Amendment rights in speaking about these matters of public concern. Defendants Henderson and deGuzman were vested by Defendant District of Columbia with authority as policymakers for establishing and carrying out the policies of DCPS and were vested with final policymaking authority under the law of the District of Columbia.

106.    Specifically, and without limitation, Defendant District of Columbia and Defendants Henderson and Mr. deGuzman, in their individual capacities, violated Plaintiff's First Amendment rights by circumscribing his duties as alleged herein, taking other adverse actions against him as described above, and in terminating his employment as Director of Food Services on January 14, 2013.

107.    The termination of Plaintiff's employment was a direct result of his exercise of his First Amendment right of free speech.

108.    The motivation for Plaintiff's termination was the retaliatory animus of Defendants against Plaintiff for exercising his right to speak freely on matters of public concern relating to fraud, waste, and abuse by Chartwells and by the District of Columbia in its contracting process and its gross mismanagement of its food service vendor contracts.

109.    Plaintiff's interest in exercising his First Amendment rights and the public's interest in lawful and honest performance of contracting and procurement in the District of Columbia far outweighs any hypothetical interest of Defendant District of Columbia, or Defendants Henderson and Mr. deGuzman, in illegally suppressing Plaintiff's speech on matters of public concern.

110.    The actions of the Defendants to deprive Plaintiff of his First Amendment rights were taken under color of state law within the meaning of 42 U.S.C. §1983.

111.    Defendants Henderson and deGuzman violated a clearly established right about which a reasonable person would be aware, namely the right to speak freely on matters of public importance.

112.    The actions of Defendants, as described above, directly and proximately caused Plaintiff's injury, including loss of economic opportunities, pain and suffering, substantial cost, damage to his professional reputation, and loss of future income and benefits.

113.    Defendants Henderson and deGuzman acted maliciously, willfully, wantonly and in reckless disregard for Plaintiff Mills' constitutional rights.

## COUNT TWO

### CONSTITUTIONAL DEFAMATION: DEPRIVATION OF PLAINTIFF'S FIFTH AMENDMENT LIBERTY INTEREST IN VIOLATION OF 42 U.S.C. § 1983 AGAINST DEFENDANTS DISTRICT OF COLUMBIA AND HENDERSON

114.    Plaintiff incorporates as though fully restated herein each of the allegations contained paragraphs 1 through 113 above.

115.    The Due Process Clause of the Fifth Amendment of the United States Constitution protects an individual's right to follow a chosen trade or profession without governmental interference.

116.    Defendant District of Columbia's termination of Plaintiff's employment and the publicity attached thereto suggested that Plaintiff was terminated for reasons unrelated to his performance of his job.  In so doing, the termination and the stigma or disability associated with it generally blocked Plaintiff Mills from obtaining employment in his chosen field of interest, *i.e.*, management of food services in schools.

117.    Defendant Henderson's statements to *The Washington Post* in December 2011 falsely suggested that Plaintiff was responsible for significant cost overruns in the food services program, calling into question his competence and integrity.  In February 2012, Chancellor Henderson falsely suggested in correspondence to Councilmember Cheh that Mr. Mills had provided food services plans to the D.C. Council wrongly or through some kind of subterfuge. The contents of the letter were reported in a local food blog and *The Washington Post*.  In March 2012, Defendant Henderson wrote a letter to the D.C. Council in response to concerns about contractual irregularities by Chartwells saying that she did not have confidence in her food services team, implying wrongdoing by Plaintiff Mills, the head of the food services team.  The letter was leaked to the press.  In December 2012, Defendant Henderson falsely suggested on the Kojo Nnamdi radio show that Plaintiff Mills was responsible for the significant cost overruns in food services, again calling into question his competence and integrity.

118.    Defendant Henderson's statements generally blocked Plaintiff from pursuing or obtaining employment in the management of food services in schools. Plaintiff was told by a responsible representative of another public school system shortly after his termination that he was a perfect fit for that system's vacant position as director of food services but that it would be an undue risk and a possible public or political liability, based on the reported rift between Mr. Mills and Chancellor Henderson, for the system to hire Plaintiff and that it would accordingly not consider him as a candidate.

119.    Defendant District of Columbia's termination of Plaintiff's employment, which Defendant Henderson ordered, created a stigma that has foreclosed and continues to foreclose Plaintiff's freedom to take advantage of other employment opportunities, to continue to lose wages and to be unable to secure permanent employment in his chosen field, thereby substantially reducing the value of Plaintiff's human capital.

120.    The actions of Defendant Henderson to deprive Plaintiff of his Fifth Amendment rights were taken under the color of state law within the meaning of 42 U.S.C. § 1983.

121.    Defendant District of Columbia and Defendant Henderson violated a clearly established constitutional right about which a reasonable person would be aware. Defendant Henderson could have foreseen that the effect of her comments about Plaintiff Mills and the termination of his employment – particularly in the middle of an academic year – would negatively affect his ability to obtain employment in his chosen profession.

122.    As a direct and proximate result of the actions of Defendant District of Columbia and Defendant Henderson, Plaintiff has suffered and continues to suffer from injury to his liberty interest under the Fifth Amendment, including embarrassment, humiliation, mental anguish, and loss of reputation.

123.    Defendant Henderson acted maliciously, willfully, wantonly and in reckless disregard for Plaintiff Mills' constitutional rights.

## COUNT THREE

### RETALIATION IN VIOLATION OF
### THE D.C. WHISTLEBLOWER PROTECTION ACT, D.C. CODE § 1-615.51 *et seq.*,
### AGAINST DEFENDANT DISTRICT OF COLUMBIA

124.    Plaintiff hereby incorporates as though fully restated each of the factual allegations set forth in paragraphs 1 through 123 above.

125.    The District of Columbia Whistleblower Protection Act ("DCWPA") prohibits a supervisor from taking, or threatening to take, a prohibited personnel action, or from otherwise retaliating against an employee because of the employee's protected disclosure or refusal to comply with an illegal order.

126.    At all times relevant to this Complaint, Mr. Mills was an "employee" within the meaning of the DCWPA.

127.    At all times relevant to this Complaint, Defendants Henderson and deGuzman were "supervisors" within the meaning of the DCWPA.

128.    Mr. Mills repeatedly made protected disclosures within the meaning of the DCWPA, culminating in his meeting with Ms. Ruda in December 2012 in which he laid out in comprehensive detail the pervasive problems he had observed with DCPS's management of the food services program and Chartwells' fraud on the District and blatant noncompliance with its contractual obligations. Mr. Mills' complaints involved every category of protected disclosures under the DCWPA, including gross mismanagement, misuse or waste of public funds, and abuse of authority. Mr. Mills also disclosed violations by Chartwells and District officials of the NSLP and other federal laws and regulations, and specific violations of the contract with Chartwells.

Finally, Mr. Mills reported substantial and specific dangers to the public health and safety, including serving unfit or spoiled food and failing to adequately screen employees' backgrounds, resulting in the hiring of a convicted child sex offender. Mr. Mills reported these problems beginning in 2010 to his direct supervisor, Mr. Tata, and subsequently to Defendant deGuzman, Defendant Henderson, Ms. Bazemore, Ms. Ruda, DCPS legal counsel and other D.C. officials.

129.    On January 14, 2013, DCPS terminated Mr. Mills' employment. This claim is timely filed.

130.    Mr. Mills' protected disclosures were a contributing factor in the retaliation to which Defendants subjected him. In response to every attempt to remedy the problems he had observed and raised with his supervisors, Mr. Mills faced silence or hostile resistance, and Defendants took numerous steps to disparage him in the press and to the Council, to marginalize him and hinder his ability to perform his duties, and to tarnish his reputation. Defendants provided direct evidence of retaliatory intent in the month before his termination when Ms. Ruda informed Mr. Mills that he was no longer wanted at DCPS because his complaints about vendor misconduct had upset various DCPS officials.

131.    The District's actions have caused Mr. Mills substantial economic loss, emotional harm, and damage to his career and professional reputation.

## COUNT FOUR

### RETALIATION IN VIOLATION OF
### THE DISTRICT OF COLUMBIA FALSE CLAIMS ACT, D.C. CODE § 2-381.04
### AGAINST DEFENDANT DISTRICT OF COLUMBIA

132.    Plaintiff hereby incorporates as though fully restated each of the factual allegations set forth in paragraphs 1 through 131 above.

133.    The District of Columbia False Claims Act ("DCFCA") prohibits an employer, including the District of Columbia, from discharging, demoting, suspending or in any manner discriminating against an employee because of in the terms and conditions of employment because of lawful acts done in furtherance of an action under the DCFCA or to stop one or more violations of the DCFCA.

134.    Mr. Mills investigated, reported and attempted to stop numerous violations of the DCFCA. Nearly all of Chartwells' misconduct about which Mr. Mills complained could lead to a viable cause of action under the DCFCA, as it involved the submission of false and inflated claims for payment to the District of Columbia.

135.    The District of Columbia was aware of Mr. Mills' protected activity, as he complained about the issues directly to his managers, including Defendants Henderson and deGuzman, and to individuals outside his chain of command, including the DCPS Office of the General Counsel. His complaints specifically referenced overcharging for food, failing to find the lowest prices, failing to pass on rebates, and intentional overstocking of food, all of which caused the District to overpay by millions of dollars, and he urged the District to take legal action to recoup overpayments, as other school districts had done.

136.    The District of Columbia terminated Mr. Mills' employment in retaliation for his protected activity. In response to every attempt to remedy the problems he had observed and raised with his supervisors, Mr. Mills faced silence or hostile resistance, and employees of the District of Columbia took numerous steps to disparage him in the press and to the Council, to marginalize him and hinder his ability to perform his duties, and to tarnish his reputation. The District of Columbia provided evidence of retaliatory intent in the month before his termination

when Ms. Ruda informed Mr. Mills that he was no longer wanted at DCPS because his

complaints about Chartwells had upset various DCPS officials.

137.    Defendant District of Columbia's actions have caused Mr. Mills substantial

economic loss, emotional harm, and damage to his career and professional reputation.

## COUNT FIVE

## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY AGAINST DEFENDANT DISTRICT OF COLUMBIA

138.    Plaintiff hereby incorporates as though fully restated each of the factual

allegations set forth in paragraphs 1 through 137 above.

139.    District of Columbia common law prohibits the discharge of an employee for his

refusal to violate the law or for his actions in furtherance of a public policy of the District as

manifested in a statute or regulation.

140.    D.C.'s anti-fraud statute, D.C. Code § 22-3221, reflects a clear mandate of public

policy against the commission of fraud.  D.C. laws and regulations also evidence a strong public

policy of protecting the District's citizens from harmful foods.  Such laws include D.C. Code §

48-101 *et seq.*, including the prohibition on the sale, exchange or delivery of adulterated food or

drugs.  Finally, D.C. has a strong public policy in favor of protecting children and the general

public from convicted sex offenders, as evidenced by its extensive sex offender registration and

monitoring system and its various child welfare and protection laws.

141.    Mr. Mills repeatedly took actions in furtherance of the District of Columbia's

public polices against fraud, the public dissemination of harmful foods, and the exposure of

children and the general public to sex offenders.  Mr. Mills made numerous reports and

complaints verbally and in writing to various D.C. officials, including his supervisors,

44

Defendants Henderson and deGuzman, about conduct that violated laws and regulations closely relating to these public policies.

142.    In response to his disclosures of conduct violative of D.C. public policy, and his refusal to ignore the illegalities he observed, Mr. Mills was prohibited by Defendants Henderson and deGuzman and other D.C. officials from addressing these issues appropriately, and Defendants excluded Mr. Mills from fundamental aspects of his job responsibilities, publicly disparaged him, and lodged against him baseless allegations of unethical conduct.  Finally, on or about January 14, 2013, Defendant District of Columbia terminated Mr. Mills' employment.

143.    Mr. Mills' protected activity was causally connected to the adverse actions he suffered.

144.    Defendant District of Columbia's actions have caused Mr. Mills substantial economic loss, emotional harm, and damage to his career and professional reputation.

## REQUESTED RELIEF

WHEREFORE, Plaintiff prays this Court for the following relief:

1.    Entry of a judgment in Plaintiff's favor and against all Defendants under Count One for violation of Plaintiff's rights under the First Amendment;

2.    Entry of a judgment in Plaintiff's favor and against Defendants District of Columbia and Henderson under Count Two for violation of Plaintiff's rights under the Fifth Amendment;

3.    Entry of a judgment in Plaintiff's favor and against Defendant District of Columbia under Count Three for violation of the District of Columbia Whistleblower Protection Act;

4.    Entry of a judgment in Plaintiff's favor and against Defendant District of Columbia under Count Four for violation of the District of Columbia False Claims Act;

5.    Entry of a judgment in Plaintiff's favor and against Defendant District of Columbia for wrongful termination in violation of public policy;

6.      Reinstatement of Plaintiff to his former position with seniority and benefits, or front pay in lieu of reinstatement;

7.      An award of back pay with interest, including two times back pay for violation of the District of Columbia False Claims Act;

8.      An award of compensatory damages for emotional pain and suffering and reputational harm, in an amount to be proven at trial;

9.      An award of punitive damages against the individual Defendants, in an amount to be proven at trial;

10.     An award of reasonable attorneys' fees and costs; and

11.     An award of all other relief the Court deems just and proper.


Respectfully submitted,


Lisa J. Banks (D.C. Bar No. 470948)
Debra S. Katz (D.C. Bar No. 411861)
Michael A. Filoromo, III (D.C. Bar No. 982102)

KATZ, MARSHALL & BANKS, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C. 20009
(202) 299-1140
(202) 299-1148 (fax)


Attorneys for Plaintiff Jeffrey Mills


Dated: April 30, 2014

46